MISSISSIPPI POWER & LIGHT CO. *et al. v.* SMITH.

(Division A. March 12, 1934.)

[153 So. 376. No. 30745.]

448

C. E. Gibson, of Monticello, Brady, Dean & Hobbs, of Brookhaven, and Green, Green & Jackson, of Jackson, for appellants.

452

E. B. and H. J. Patterson, of Monticello, and Hall & Hall, of Columbia, for appellee.

**McGowen, J.,** delivered the opinion of the court.

The Mississippi Power & Light Company and J. W. Tynes prosecuted an appeal to this court from an adverse judgment against them in favor of Mrs. Anna Smith and her children, the widow of Zeb Smith, deceased.

The declaration charged that the appellants were engaged in operating a cotton gin and failed to use reasonsonable care to provide Zeb Smith with a safe place to work. It was charged that he was required to work, in the operation of the gin, in close proximity to three belts, two small ones, two or two and one-half inches wide, and one large belt about seven inches wide, which moved rapidly over pulleys, and that this large belt was old,

badly worn, frazzled, and rotten, and the strain upon it created a condition of danger, in that the belt was liable to break and injure some one, and this belt broke and caused the injuries sustained by Zeb Smith. He was badly mangled, his arm being torn off, lived a few hours in agony, and died as a result of the injuries.

1. It is insisted that, on the facts of the case, neither of the appellants were liable, and that they were entitled to a peremptory instruction. In the argument for the peremptory instruction, it is contended that the breaking of the belt was not the proximate cause of the injuries, that it was an accident which could not be foreseen, and that Smith was in charge of the gin and could have remedied the defect in the belt, and that he was free to make such changes as were necessary, because there were other belts there. It was also contended that appellee's witnesses were so thoroughly impeached and contradicted that their evidence should have been disregarded by the court, and that all the physical facts show that, if the belt broke, it could not have caused the injury.

Zeb Smith applied to Tynes for work on September 23, 1931, and was by Tynes put to work in charge of the operation of the cotton gin, and on the next day Smith received the injuries from which he died. There were only two eyewitnesses to the accident, and they testified that a small belt had run off the pulley; that Smith was engaged in replacing the belt, and, for some reason, the idler which held the belt did not work, and he was adjusting the idler, and, while so engaged, the seven-inch seed auger belt broke, slapped Zeb Smith on the leg, and threw him into the pulleys and machinery. The seven-inch seed auger belt was introduced in evidence, the jury saw it, and the jury also visited the gin, the scene of the accident. It appears that this belt was in two pieces, put together with rivets, and that it was not entirely broken apart, being held together by rivets for about one inch,

but on the balance the rivets had either pulled out, or had torn their way through the fabric of which the belt was composed.

Much stress is laid on the fact that one witness said the belt could have struck the clothes of the decedent and he could have thereby been drawn into the machinery. However, the witnesses stated that it did not so occur. It is undisputed that Smith was working at the place and in a proper manner as required of a man operating a gin. Tynes operated the gin and other plants owned by the Mississippi Power & Light Company on a salary as general superintendent, or manager.

There is conflict in the evidence as to whether it was the duty of Smith, in order to place the small belt on the pulley, and put the idler in position, to have stopped the gin, which could have been done by pressing a button. Tynes testified that he had made such adjustments as Smith was making as many times as he had hairs on his head; that is, without stopping the machinery. Some of the witnesses testified that the machinery should have been stopped, while others testified that the trouble with the idler and the small belt could not have been corrected except while the gin was in operation.

Hedgepeth, a witness, testified that he heard Smith tell Tynes, the evening before the accident, that the large belt was old and rotten, and that, if Tynes would allow him to shut down the gin, he would fix that belt, and that Tynes replied as follows: ''We haven't got anything to fix it with, anything any better than we have, you run this gin two or three days and we will get you a new one,'' and that Smith replied: ''You get it as quick as you can, this one is old and rotten and it is dangerous, somebody is liable to get hurt, it is almost in two now.''

There was an issue of fact as to whether or not the belt was old and rotten, or was safe for the purpose for which it was intended and used.

Tynes denied the above conversation with Smith.

It is apparent that the plaintiff, on the question of a peremptory instruction, made a case which should be submitted to a jury. The evidence is clear that Tynes was the superintendent, in control, the alter ego of the master, and that he directed Smith to operate the gin, and, while the belt itself was an instrumentality, it was permanently a part of the place in which Smith had to work. It was a question for the jury as to whether or not he was performing his duties under the direction of Tynes in a proper way. If the master furnished a rotten belt, the jury saw it. It was a question for the jury as to whether or not the breaking of the belt was the proximate cause of the injury.

Then Smith did not assume the risk increased by the appellant's negligence, section 513, Code 1930, and from his standpoint it is shown that he was performing his duties as required of him by Tynes and in the prescribed method, after Tynes promised to get him a new belt in a short time. See Restatement, Agency, sections 522 and 523, and Hercules Powder Company v. Tyrone, 155 Miss. 75, 124 So. 74, 475.

There was conflict as to whether or not Smith was experienced in the operation of a gin.

1. It is next insisted that the court should have set aside the verdict because the witnesses, Turner and Sanders, were thoroughly impeached.

As often happens in this kind of case, the claim agent of the power company had called upon the witnesses and had secured written statements, in which the appellant was absolved from any kind of negligence in so far as these witnesses knew. The witnesses, Turner and Sanders, repudiated these statements, and testified that the statements presented were not the ones they had made. They were impeached or contradicted in this by a number of witnesses to the written statements, which

makes the usual case of a conflict in the evidence to be passed upon by a jury selected for that purpose, and not by the court.

We do not think the court erred in refusing to grant a new trial. We think the weight of the evidence and the credibility of the witnesses was purely a question for the jury. In addition to that, the judge, as well as the jury, who tried the case, saw the witnesses, and observed their demeanor on the witness stand, and his judgment ought not to be disturbed, unless it is evident, for some reason, that the evidence adduced for the plaintiff in the court below is unreasonable or unbelievable. We are therefore of the opinion that no error can be predicated upon the action of the court in refusing the peremptory instruction and in refusing to grant a new trial.

2. The appellant insists that the relation of master and servant did not exist between the parties. This is based upon the fact that Tynes and the power company, on July 14, 193—, entered into a written contract by which Tynes agreed to purchase, for seven thousand seven hundred fifty dollars cash, the cotton gin here involved, and the Mississippi Power & Light Company agreed to sell same to Tynes. This contract provided that, if the power company was successful in having a mortgage canceled, its board of directors to approve the sale, it would then convey this property to Tynes, if he would raise and pay the money; that, if the property should be destroyed before the delivery of the deed conveying said property, then the power company should retain the insurance, Tynes having no interest therein, and that, upon consummation of the contract and conveyance of the property, certain adjustments as to replacements and repairs should be made. If and when the deed was delivered Tynes was to have the proceeds arising therefrom beginning July 1st, and, if the deed was not delivered, the power company should have the pro-

ceeds. Prior to the execution of this contract, Tynes had managed an ice plant, gin plant, and other property for the power company, for which he was paid a salary. Zeb Smith was killed on September 24, 1931, and on the following day the power company delivered to Tynes a deed to the property in pursuance of the contract.

We think the solution of the question is easy. The contract, as written, controls, and it was therein stated that Tynes should have no interest in the property until the deed was delivered, and the deed was not delivered until after Zeb Smith's injuries and his death. Therefore the property was that of the Mississippi Power & Light Company on the date of the injury, and it is liable, as master, in so far as this question is concerned.

It is insisted, however, that the doctrine of relation back should be applied as against Smith in this case. It is quite true that people may make executory contracts to be completed, in the future, by the delivery of deeds, or otherwise, and that, when executed, may be made to relate back to a period anterior to that of the contract. But this doctrine is never invoked for the purpose of defeating the collateral rights of third persons lawfully acquired. In other words, Tynes' contract with the power company, completed after the injury, would not be allowed to relate back, in so far as innocent third parties are concerned. 53 C. J., section 1185, note 79, and the authorities there cited.

We have hitherto construed this contract to mean that, until it was fully executed, Tynes operated the gin as superintendent or general manager of the power company, at the risk of the master, just as he had done before the contract of sale was entered into. Neither was there any adverse action upon the part of Tynes in so continuing the business—it was agreed thus to be done.

Under this head, appellant argues that especially may there be no recovery upon an allegation of the joint neg-

ligence of Tynes and the power company, citing Kimbrough v. Ragsdale, 69 Miss. 677, 13 So. 830, and Spann et al. v. Grant, 83 Miss. 23, 35 So. 217, 218. An examination of these cases shows they were based upon contracts alleging joint liability, when it was proved there was only several liability of one defendant. In an action of tort, where there are two or more parties' concurrent negligence bringing about an injury to a third party, both are liable therefor, and suit may be brought either jointly or severally. See Nelson v. Illinois Cent. R. Co., 98 Miss. 295, 53 So. 619, 31 L. R. A. (N. S.) 689; St. Louis & S. F. R. Co. v. Sanderson, 99 Miss. 148, 54 So. 885, 46 L. R. A. (N. S.) 352. In this last case the master was liable because of its nondelegable duty to the public—its passenger—and the conductor was liable for his tortious act in shooting and killing Sanderson, the husband of the plaintiff, and was likewise held responsible therefor. The liability proceeded from different principles of law. See, also, Thomas v. Rounds, 161 Miss. 713, 137 So. 894.

3. The appellant urges that, if it be assumed that the power company was Smith's master, then there could be no liability upon Tynes, relying upon the case of Feltus v. Swan, 62 Miss. 417, wherein Judge CAMPBELL said: "The appellee being a mere agent was not liable for an omission of duty except to his principal. . . . The charge against him was only that he had failed to do, and not that he had done anything maliciously, and for nonfeasance or omission to act at all the agent is answerable only to his employer." There, the court had before it a suit against the owner and his manager, in which it was charged that the negligence of the manager caused plaintiff's adjoining land to be overflowed.

We could content ourselves by simply citing the case of Mullican v. Light & R. Co., 121 Miss. 806, 83 So. 816, 819, 9 A. L. R. 165, which overruled or modified the Feltus case, wherein this court said: "The appellant contends

that the light company was the agent of Crawford, and as such agent negligently failed to keep the plant lighted as a duty owed to Crawford and the deceased employee, Mullican. We have reviewed exhaustively the authorities on the question of the liability of agents for negligence, in the performance of duties, to principals and third persons, and with much interest we have observed the distinctions made between acts of nonfeasance and misfeasance, or acts of omission and commission. We find our own court in Feltus v. Swan, 62 Miss. 415, held that a mere agent is not liable for an omission of duty except to his principal. This rule appears to be well established in the text-books and many decisions in other states. However, the more modern rule, which we think is based upon better reasoning, is that the relation of agency does not exempt a person from liability for an injury to a third person resulting from his neglect of duty for which he would otherwise be liable. This liability is not based upon the contractual relation existing between the principal and agent, but upon the common law obligation that all persons must so use that which he controls as not to injure another. But it must be borne in mind that this rule of liability always rests upon the question of the duty of the agent toward the injured party and his negligent disregard or violation of that duty, and that where no duty exists there can be no liability. It is the fact that the agent is guilty of a wrongful or negligent act amounting to a breach of duty which he owes to the injured person that makes him liable. It seems, therefore, that the modern rule tends to abolish the distinction between the agent's acts of commission and omission wherever such act involves a breach of duty. 21 R. C. L. 851; Story on Agency, section 309.''

It may be observed that Judges Cook and Etheridge, in dissenting, cited the illuminating case of Osborne v.

Morgan, 130 Mass. 102, 39 Am. Rep. 437. On the point there discussed, the entire court was in agreement.

The rule now generally is that, if both the agent and the master owe a duty to another, they may be held liable for a breach thereof jointly or severally, although the liability may spring from a different rule of law.

The liability of the power company springs from the humane principle of law that a master may not delegate his duty to use reasonable care to furnish his servants a safe place in which to work (and not from the doctrine of respondeat superior), and, if he does so delegate it, he may not escape liability therefor. In this case, Tynes, the agent, is not liable because of his agency, and his physical presence at the time of the injury is not persuasive. He directed Smith to work at that point, and the duty which he owed him was that of the common law, independent of agency. His liability is not because of his agency, but in spite of it. It springs from tort and not from contract. See 7 Labatt's Master & Servant (2 Ed.), sections 2585 to 2587, inclusive, and the splendid notes there found, also Restatement, American Law Institute, Agency, sections 577 and 578.

We adhere to the doctrine announced in the Mullican case, cited supra, decided by our own court. Tynes is held liable because he was a wrongdoer, in that he did not discharge the common-law duty which he owed to Smith. Tynes was the only man who assumed to direct Smith, and it was Tynes' duty to exercise reasonable care to prevent injury to him. The verdict of the jury is that Tynes failed in this respect, and he is therefore liable.

4. It is said there is a nonjoinder of parties; that the administratrix of Zeb Smith's estate was a necessary party. A long time before this suit was brought, letters of administration, as authorized by section 1628, Code 1930, were issued to Mrs. Mattie Gunning, intestate's sister. Upon a petition presented, the chancellor authorized

the employment of a certain attorney to represent the administratrix in the bringing of a suit, or settling with the appellant for the death of Zeb Smith. It was ordered by the chancery court that said attorney be compensated for his services therein in a sum equal to fifty per cent. of the recovery. After the signature of the chancellor to the decree, there appears this entry:

"I hereby accept the above claim and cause of action and agree to prosecute the same to settlement or judgment on the terms above set forth.

"E. B. Sauls, Jr., Attorney."

Leaving out of view the testimony of Mrs. Gunning as to the peculiar circumstances attendant upon the proceedings to have her appointed as administratrix and the order appointing the attorney and fixing his compensation, we are of the opinion that this decree and contract, if it be one, with an attorney on the part of the administratrix, can have no effect upon the right of the widow and children to institute and maintain the suit. The administratrix did not institute a suit, nor otherwise proceed under the decree. The widow and children did institute a suit and did prosecute same.

Under section 510, Code 1930, the administratrix or personal representative is authorized to bring suit, but it is equally clear, under said section, that the widow and children are also authorized to bring suit for the death of their intestate. Section 510 protects all parties as to their right to participate in a proceeding to recover. The statute gives no preference, and we have definitely settled that the one who first brings the suit has the right to prosecute and maintain it to a conclusion. In the case of J. J. Newman Lbr. Co. v. Scipp, 128 Miss. 322, 91 So. 11, this court said that: "As between the personal representative and the wife, with reference to priority in the right to sue, we think the statute does not discriminate, but

places them upon equal ground, and the rule 'First in time, first in right,' applies.''

The distribution of the proceeds of the judgment is controlled by section 510 and the rights of the assignee, if there be one, on a claim for attorney's fees, are therein fully protected. In other words, the payment of the judgment is a discharge of the appellant.

We are therefore of the opinion that the administratrix is not a necessary party to the suit brought by the widow and children of the intestate for his death.

5. We are further of the opinion that, in view of the conclusion we have reached, there was no reversible error in the admission of evidence, nor in the granting of instructions, nor otherwise in the trial of this case in the court below.

Affirmed.